**E-FILED**
Friday, 17 April, 2020  05:32:57 PM
Clerk, U.S. District Court, ILCD

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Central District of Illinois

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| INFORMATION ASSOCIATED WITH 217-441-1421 THAT IS STORED AT PREMISES CONROLLED BY VERIZON WIRELESS | ) ) ) |

Case No. 20-MJ- 3047

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ **Central** _____ District of _____ **Illinois** _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of a controlled substance |
| 21 U.S.C. § 846 | Conspiracy to distribute controlled substances |

The application is based on these facts:

See attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Russell Lehr
*Applicant's signature*

Russell Lehr, DEA Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
**E-mail and telephone** _____ *(specify reliable electronic means)*.

Date: _____ April 16, 2020 _____

s/Eric Long
*Judge's signature*

City and state: Urbana, Illinois

Eric I. Long, United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
IN THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH **217-441-1421** THAT IS STORED AT PREMISES CONROLLED BY **VERIZON WIRELESS** | Case No. 20-mj-3047 _____<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Russell Lehr, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by Verizon Wireless, a wireless provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey ("Verizon").  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Verizon to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.     I am a Task Force Officer ("TFO") with the Drug Enforcement Administration (DEA) currently assigned to the Springfield, Illinois Resident Office (SRO). I have been employed with the DEA since June of 2019. I have been employed with the Springfield Police Department in Springfield, Illinois for more

than 15 years. I have specialized training in various aspects of narcotics investigations which include, but are not limited to, interviewing defendants, surveillance techniques and money laundering. I have personally conducted or assisted in numerous investigations of state and federal criminal violations involving the illegal trafficking of narcotics and related crimes. I have helped prepare numerous criminal affidavits, executed search warrants and testified at criminal trials during my participation in investigations. I have assisted with search warrants for precise location information (GPS), cell-site location and searches of electronic devices.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of  Title 21, United States Code, Sections 841 (a)(1) and 846, have been committed by Steven M. WELLS. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

2

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States… that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.     In approximately March 2020, the Illinois State Police (Central Illinois Enforcement Group CIEG) and DEA Springfield Residence Office (SRO), acquired a Confidential Source ("CS"). The CS is controlled by both the Illinois State Police and the DEA. The CS is working with authorities for consideration on a pending state sentence for robbery.

7.     The Illinois State Police and DEA cultivated a confidential source in 2020, (DEA Confidential Source 20-162074) ("CS"). The CS has thirteen arrests, two convictions for dangerous drugs, one conviction for weapon offenses, one conviction for robbery and one conviction for traffic offenses. The CS has provided reliable information to the DEA relating to gun and drug trafficking activity in the Springfield, Illinois area. The CS has participated in approximately four controlled purchases while working with the DEA. As detailed below, the CS conducted controlled purchases of purported crack cocaine from Steven WELLS, while wearing covert audio/video recording equipment. As part of CS's cooperation, law enforcement informed CS that prosecutors would be made aware of CS's

3

cooperation, which might be taken into consideration at his sentencing hearing. Based upon information provided by the DEA I believe information provided by CS is reliable.

8.      To date, the CS has received the following compensation from the Illinois State Police: $100.00 on March 27, 2020, for payment of a phone bill and $150.30 on April 6, 2020, for partial payment towards an overdue CWLP bill, which had a balance of $640.00. The CS is currently unemployed and has not been able to secure employment due to the COVID-19 pandemic and the stay at home order.

9.      In March 2020, DEA, ISP/CIEG, and the Springfield Police Department PAC Unit initiated an investigation involving an individual identified as a Bos Playas (BP) street gang member, Steven M. WELLS. The CS identified WELLS as a crack cocaine distributor in the Springfield, Illinois area. The CS advised that the CS can purchase crack cocaine from WELLS and that WELLS sells crack cocaine for Paul DAVIS who is another documented BP street gang member. The CS was also able to provide agents with additional information about other BP street gang members who were involved in the distribution of crack cocaine.

10.      The CS provided agents with telephone number 217-441-1421 (the TARGET CELL PHONE) for Wells. The CS received the telephone number from another BP gang member who the CS had conducted a controlled purchase of crack cocaine. A DEA administrative subpoena for telephone subscriber information

4

revealed the subscriber for Target Cell Phone to be Phone In the Box OAS, 295 Park Shore Drive, Folsom, CA 95630.

## PROBABLE CAUSE

Controlled Purchase # 1

11.     On March 25, 2020, the DEA SRO, ISP CIEG and SPD PAC Unit formulated a plan to utilize DEA Confidential Source 20-162074 ("CS") to conduct a controlled purchase of crack cocaine from a known Springfield based Bos Playas gang member, Arthur McCLAIN ("McCLAIN"), utilizing $650 in DEA official advanced funds (OAF) in Springfield, Illinois.

12.     The Illinois State Police and DEA utilized a confidential source in 2020, DEA Confidential Source 20-162074 ("CS"). The CS has thirteen arrests, two convictions for dangerous drugs, one conviction for weapon offenses, one conviction for robbery and one conviction for traffic offenses. The CS has provided reliable information to the DEA relating to gun and drug trafficking activity in the Springfield, Illinois area. The CS has participated in approximately four controlled purchases while working with the DEA. As detailed below, the CS conducted controlled purchases of purported crack cocaine from Steven WELLS, while wearing covert audio/video recording equipment. As part of the CS's cooperation, law enforcement informed the CS that prosecutors would be made aware of CS's cooperation, which might be taken into consideration at his sentencing hearing. Based upon information provided by the DEA I believe information provided by the CS is reliable.

5

13.     To date, the CS has received the following compensation from the Illinois State Police: $100.00 on March 27, 2020, for payment of a phone bill and $150.30 on April 6, 2020, for partial payment towards an overdue CWLP bill, which had a balance of $640.00. The CS is currently unemployed and has not been able to secure employment due to the COVID-19 pandemic and the stay at home order.

14.     On March 25, 2020, at approximately 11:52 a.m., SPD PAC Officer Ben McGill, DEA Special Agent (SA) Santoyo and I met with the CS at a pre-arranged location.  Prior to the meeting, the CS contacted McCLAIN at phone number 217-766-8405 via call and text messages. All contact between the CS and McCLAIN was recorded and captured on a consensual monitoring device on a phone given to the CS by law enforcement.

15.     At approximately 11:55 a.m., I searched the CS's vehicle for items of contraband, while SA Santoyo searched the CS. No items of contraband were found in the vehicle or on the CS.  At approximately 11:57 a.m., the CS made a recorded phone call to McCLAIN at phone number 217-766-8405 to arrange for the purchase of crack cocaine. McCLAIN answered the phone and told the CS to come by his residence. At approximately 11:59 a.m., the CS called McCLAIN back to find out what house McCLAIN was currently at. McCLAIN told the CS to come by his house at 16th Street and Brown Street, which was later identified as 1226 South 16th Street, Springfield, IL.

16.     At approximately 12:01 p.m., the CS was provided with $700 DEA USC/OAF for the buy. The CS was also equipped with multiple video/audio

6

recording devices which were turned on at approximately the same time by Officer

McGill and SA Santoyo. At approximately 12:03 p.m., the CS then left the pre-

arranged location to meet McCLAIN and was followed by TFO Lehr, SA

Santoyo and SPD PAC Officer McGill. Agents kept the CS vehicle under constant

surveillance.

17.     At approximately 12:11 p.m., the CS's vehicle was observed by SPD

PAC Officer Raynolds driving northbound on 16th Street. The CS's vehicle pulled

over to east side of the road. At approximately 12:16 p.m., ISP Inspector Mayes

observed a black male, later identified by law enforcement as McCLAIN, exit the

residence of 1226 South 16th Street and enter the CS's vehicle. The CS's

vehicle pulled away from the curb. Agents continued to keep the CS's vehicle under

constant surveillance.

18.     As agents were monitoring the audio of the controlled purchase, at

approximately 12:19 p.m., myself, SA Santoyo and Officer McGill heard

McCLAIN talking to a subject over his cellular phone (later identified as Bos Playas

(BP) street gang member Steven M. WELLS).  McCLAIN is heard telling WELLS,

"[s]hit I'm trying to get like a little half time, a half time, shit, I'm on the east side,

you say you're off 6th Street. Where off 6th Street? Alright, alright, make sure it's

all there for me." The CS is then heard asking McCLAIN where WELLS was at, to

which McCLAIN responds that WELLS is at the Walmart on South 6th Street.

19.     At approximately 12:30 p.m., the CS's vehicle was observed by SPD

PAC Officer Egan pulling into the parking lot of Walmart located at 1100 Lejune

7

Drive in Springfield, IL (which is located off of 6th Street). The CS's vehicle pulled into a parking spot in the middle of the parking lot. The CS and McCLAIN both remained inside the vehicle. The CS's vehicle was kept under constant surveillance. SA Santoyo, Officer McGill and I heard the CS ask McCLAIN, "What'd he say?" (the CS later stated that the CS was referring to text message conversations that McCLAIN was having with WELLS at the time). McCLAIN responded to the CS that WELLS was "five minutes away."

20.     At approximately 12:44 p.m., I observed a Chevrolet Equinox, silver in color, with black wheels, (Equinox) travel southbound into the parking lot from Brevis Drive in Springfield. I recognized the Equinox as a vehicle that Steven M. WELLS had been observed driving during numerous surveillance details. At approximately the same time, McCLAIN is heard talking with someone on his phone, later identified as WELLS. McCLAIN is heard guiding WELLS into the Walmart parking lot to go to the location of where the CS's vehicle was parked. The CS's vehicle was observed by Inspector Mayes backing out of the parking spot. The CS's vehicle then began to drive around the parking lot. McCLAIN continued to talk with WELLS and was overheard giving WELLS the description of the CS's vehicle.

21.     At approximately 12:45 p.m., FBI SA Krivanek observed the CS's vehicle and the Equinox pull into two separate parking spots in the northwest area of the Walmart parking lot. At approximately the same time, the agents could hear the CS counting money (which I later confirmed upon review of the video/audio

8

recording). The CS is observed handing McCLAIN the $600 in USC/OAF
and McCLAIN makes mention to the CS that he is going to take it to WELLS.

22.     At approximately 12:46 p.m., FBI SA Krivanek observed McCLAIN
exit the CS's vehicle and enter the back driver side of the Equinox. At
approximately 12:47 p.m., McCLAIN is observed exiting the Equinox and walking
back and entering the passenger side of the CS's vehicle. The video/audio recording
captured McCLAIN take a small plastic bag out of his hooded pullover pocket and
hand it to the CS. The CS then asked McCLAIN, "[i]s it all there?" McCLAIN
responded by saying "14.3" referring to the weight of the purported crack cocaine.

23.     At approximately 12:48 p.m., Inspector Mayes observed both the CS's
vehicle and the Equinox exit the Walmart parking lot. Inspector Mayes was able to
view the license plate on the Equinox as registration BX43112, which was register
to Claudia E. BANKS, 80 Mesa Road, Springfield, IL. BANKS has been identified as
Steven WELLS' girlfriend and 80 Mesa Road is the current paroled address for
WELLS.

24.     Officer McGill, and SA Santoyo and I followed the CS to the area of
1304 South Grand Avenue East where McCLAIN was observed by agents exiting
the CS's vehicle at approximately 12:56 p.m. I then contacted the CS and told the
CS to follow agents to the pre-arrainged location for debriefing.

25.     Meanwhile, Officer Eagan, Officer Raynolds, Officer Cordes, FBI TFO
Redpath, and FBI SA Krivanek followed the Equinox. Surveillance units lost sight
of the Equinox in the area of Cherylwood Drive and Marco Lane in Springfield. At

approximately 1:14 p.m., I was contacted by TFO Redpath who told me that Officer Raynolds had seen the Equinox pull onto Marco Lane and drive toward the south side of the street. I later learned through a utility check that WELLS' girlfriend, Claudia BANKS, had established utilities at 1017 Marco Lane, Apt. C, Springfield on March 20, 2020.

26.     At approximately 1:03 p.m., I, along with SA Santoyo and Officer McGill, met the CS at the pre-arranged location. SA Santoyo searched the CS and the CS's vehicle for items of contraband with negative results. SA Santoyo and Officer McGill shut off all video/audio recording equipment at approximately 1:04 p.m. I then debriefed the CS. The CS advised agents that the CS drove to meet with McCLAIN and picked him up at his residence at 1226 South 16th Street. The CS then observed McCLAIN contact Steven WELLS. McCLAIN told WELLS that the CS wanted to buy a half ounce of crack cocaine. WELLS agreed and told them to meet him at Walmart on South 6th Street. The CS stated that they drove to the Walmart where they waited for WELLS to arrive. When WELLS arrived, the CS stated that he was in the Equinox and WELLS' girlfriend was with him. The CS provided McCLAIN with $700 USC/OAF for the purchase of a half-ounce of crack cocaine. The CS stated that McCLAIN was told by WELLS to come to the Equinox, which he did. McCLAIN then returned to the CS's vehicle and provided the CS with the purported crack cocaine. The CS stated that WELLS charged them $650 USC/OAF for the purchase. The CS later provided me with unused $50 in USC/OAF.

10

27.     The CS provided agents with the purported crack cocaine, which later field tested positive for the presence of cocaine by SA Santoyo. SA Santoyo weighed the purported crack cocaine in its packaged state and it weighed approximately 14.71 grams. The CS also stated that the CS felt that the CS could purchase directly from WELLS and not have to go through McCLAIN.

28.     At approximately 1:06 p.m., under the direction of agents, the CS made a recorded phone call to McCLAIN at 217-766-8405 and requested WELLS' phone number. McCLAIN provided the CS with phone number 217-441-1421 (the TARGET CELL PHONE).  The CS later contacted the TARGET CELL PHONE (Wells) using the phone provided to the CS by law enforcement, which captured and recorded the conversation. A review of the consensual recording revealed that the CS did make contact with WELLS at the TARGET CELL PHONE. During the conversation the CS told WELLS that the phone number the CS was calling from belonged to the CS.

Controlled Purchase # 2

29.     On March 28, 2020 at approximately 1:08 p.m., Officer Raynolds, SA Santoyo and I met with DEA Confidential Source 20-162074 ("CS") to conduct another controlled purchase of crack cocaine from McCLAIN. Officer Raynolds searched the CS for contraband with negative results.

30.     At approximately 1:14 p.m., the CS placed a recorded telephone call to telephone number 217-766-8405, utilized by McCLAIN, with no answer. At approximately 1:20 p.m., the CS placed another recorded telephone call to

11

McCLAIN. During the call, the CS told McCLAIN to contact Steven WELLS at the TARGET CELL PHONE and find out how much it would cost for an ounce of crack cocaine. McCLAIN stated that he would call him and let the CS know. Phone toll analysis showed that after McCLAIN hung up the phone with the CS, the phone utilized by McCLAIN made a phone call to the TARGET CELL PHONE, which has been identified as a phone number utilized by Steven WELLS. That phone call was made at 1:20:48 and lasted approximately one minute and forty seconds.

31.     At approximately 1:29 p.m., the CS placed another recorded call to telephone number 217-766-8405 utilized by McCLAIN. During the phone call, McCLAIN told the CS that WELLS wanted to know how much the CS had for the ounce but that WELLS was ready. The CS told McCLAIN that the CS had $1,200, and that the CS was at the CS's residence.

32.     At approximately 1:33 p.m., the CS placed another recorded telephone call to telephone number 217-766-8405, utilized by McCLAIN. During the phone call, McCLAIN told the CS that he was about to call the CS back.  Phone toll analysis again showed that after McCLAIN hung up the phone with the CS, the phone utilized by MCCLAIN made a phone call to the TARGET CELL PHONE, which is a phone number utilized by Steven WELLS. That phone call was made at 1:34:48 and lasted approximately two minutes and fourteen seconds.

33.     At approximately 1:39 p.m., the CS placed another recorded call to telephone number 217-766-8405, utilized by McCLAIN. During that phone call, McCLAIN asked the CS if WELLS had called the CS yet. The CS told McCLAIN

12

that WELLS had not. McCLAIN told the CS that he would text WELLS' phone number to the CS. Phone toll analysis showed again that McCLAIN's phone number made contact with the TARGET CELL PHONE (Wells) via text message at 1:40:12.

34.     At approximately 1:41 p.m., the CS sent a text message to McCLAIN's phone number of 217-766-8405 to confirm WELLS' cellular number was the TARGET CELL PHONE. McCLAIN responded that it was. The CS then attempted to contact WELLS directly at the TARGET CELL PHONE at approximately 1:43 p.m. with no answer. The CS then sent a text message to the TARGET CELL PHONE at 1:44 p.m., stating the CS was trying to contact Wells. At approximately 1:48 p.m., the CS attempted to contact the TARGET CELL PHONE again with no response.

35.     At approximately 1:53 p.m., the CS made a recorded phone call to the TARGET CELL PHONE, utilized by WELLS. During the phone conversation, WELLS asked where the CS was, and the CS told WELLS the CS's location. WELLS then asked the CS, "[a] whole one 1250 bruh?" referring to the cost of an ounce of crack cocaine. The CS told WELLS that the CS had $1,200. WELLS agreed to meet the CS and told the CS that WELLS would call when he was close to a meet spot.

36.     At approximately 2:17 p.m., the CS made another recorded phone call to the TARGET CELL PHONE. During the course of the call, the CS and WELLS agreed to meet at Gateway Foundation Alcohol and Drug Treatment Center, located at 2200 Lake Victoria Drive, Springfield, to conduct the drug transaction.

37.    At approximately 2:20 p.m., I provided the CS with $1,200 DEA USC/OAF for the purchase of crack cocaine, which was witnessed by SA Santoyo. The CS was also equipped with multiple video/audio recording devices, which were turned on at approximately the same time by Officer Raynolds and SA Santoyo. At approximately 2:22 p.m., the CS left the pre-arranged location on foot to meet WELLS. The CS was kept under constant surveillance by myself, Officer Raynolds and TFO Redpath.

38.    At approximately 2:25 p.m., the CS made another recorded phone call to the TARGET CELL PHONE. During the course of the call, the CS asked WELLS where he was. WELLS responded, "[i]'m pulling up. Where you at?" The CS and WELLS continued to talk, and WELLS is heard telling the CS that he is passing the Quik-N-EZ at 11th Street/Stevenson Drive.

39.    At approximately 2:27 p.m., Officer Raynolds and I observed the CS walk toward the Equinox.  The Equinox was observed parked in the middle of the road in the 2200 block of Lake Victoria Drive, facing eastbound.

40.    At approximately 2:28 p.m., myself and Officer Raynolds observed the CS enter the front passenger side of the Equinox. The Equinox then departed traveling eastbound on Lake Victoria Drive and was followed by myself, SA Santoyo and Officer Raynolds. The Equinox was observed by agents pulling into the parking area of Victoria Village apartments. A short time later, the CS exited the Equinox. The CS was heard on the audio equipment exiting the Equinox. I then made phone contact with the CS and told the CS where to meet agents. The CS then walked in

14

the direction of an apartment building and stood in the common area of the apartment building to make sure WELLS was out of the immediate area before meeting with agents. After the controlled purchase, I viewed the video/audio recordings of the controlled buy. The video/audio recording captured the CS entering the Equinox. The CS and WELLS had a short discussion regarding the amount of USC/OAF the CS had. The CS was heard telling WELLS "it's all there," referring to the amount of money. The CS was also observed on video counting the USC/OAF. WELLS was heard telling the CS that he believed the CS had all the money. The CS was observed on video holding a plastic bag of suspected crack cocaine. A short time later, the CS was observed exiting the Equinox, walking toward an apartment building, and then standing in the doorway of the common area of the building. A short time later, the CS was observed exiting the common area of the apartment building and walking toward the pre-arranged location where agents told the CS to meet them. During the recording and interaction with WELLS, he is heard speaking with the CS but the recording did not capture WELLS' face.

41.     At approximately 2:34 p.m., the CS met with myself, SA Santoyo and Officer Raynolds at the pre-arranged location. The CS provided SA Santoyo with the purported crack cocaine which later field tested positive for the presence of cocaine. The purported crack cocaine had a field weight of 29.22 grams. SA Santoyo searched the CS for items of contraband with negative results. SA Santoyo and

15

Officer Raynolds shut off all video/audio recording equipment at approximately 2:35 p.m. I then debriefed the CS about what occurred.

42.     The CS advised that the CS walked to the area of the 2200 block of Lake Victoria Drive and waited to meet with WELLS. The CS stated that the CS contacted WELLS to see where he was, and that WELLS told the CS that he would be there soon. The CS stated that WELLS then arrived in the Equinox. The CS entered the Equinox on the front seat passenger side. The CS provided WELLS with $1,200 USC/OAF for the purchase of an ounce of crack cocaine. The CS stated that the CS told WELLS the money was all there and began to count it, but WELLS told the CS he trusted the CS. The CS then received a plastic bag of purported crack cocaine from WELLS. The CS stated WELLS then dropped the CS off in the area of an apartment complex. The CS walked to an apartment building and stepped inside the common area waiting for WELLS to leave the area. The CS then walked to meet agents as directed by me. The CS then gave the purported crack cocaine to SA Santoyo. After the CS was debriefed, the CS left the area. After the debriefing, the suspected crack cocaine was field-tested by SA Santoyo, which field-tested positive for the presence of cocaine. The suspected crack cocaine is currently at the DEA North Central Laboratory awaiting analysis.

Controlled Purchase # 3

43.     On April 3, 2020, at approximately 11:06 a.m., Officer McGill, SA Santoyo and I met with DEA CS-20-162074 ("CS") for the purpose of conducting a controlled purchase of crack cocaine from Steven WELLS in Springfield, Illinois.

16

44.     At approximately 11:09 a.m., the CS placed a recorded telephone call to the TARGET CELL PHONE, utilized by WELLS, who answered the phone. The CS told WELLS that "they were waiting on him."  WELLS asked the CS if they were talking about the same place, referring to the same place that they had met at previously. The CS and WELLS agreed to meet at the same location as they did the first time. WELLS then told the CS that he would call the CS when he got close to let the CS know where he was. The call ended at approximately 11:10 a.m.

45.     At approximately 11:12 a.m., the CS was provided with $1,700 DEA USC/OAF for the purchase of an ounce and a half of crack cocaine from WELLS. At approximately the same time, SA Santoyo searched the CS for contraband with negative results.

46.     Prior to agents meeting with the CS, at approximately 10:46 a.m. FBI SA Krivanek who was in the area of WELLS' residence at 1017 Marco Lane, Apt. C, Springfield, IL, observed the Equinox driving southbound on South 6th Street frontage road from Toronto Road.

47.     At approximately 11:24 a.m., the Equinox was observed by FBI TFO Redpath leaving the area of Marco Lane and Cherylwood Drive, Springfield, IL. The Equinox was kept under surveillance by TFO Redpath and SA Krivanek. At approximately 11:30 a.m., SA Santoyo and Officer McGill turned on the multiple video/audio recording devices, which the CS was equipped with. At approximately 11:31 a.m., the CS left the pre-arranged location on foot to meet

17

WELLS. The CS was kept under constant surveillance by myself, Officer McGill, Officer Cordes and SA Santoyo.

48.     At approximately 11:33 a.m. the Equinox was observed in the area of the agreed-upon meet location (2200 block of Lake Victoria Drive) by SPD PAC Officer Cordes. The CS was observed by SPD PAC Officer Cordes making contact on the passenger side of the Equinox. I later reviewed the video/audio recording of the controlled buy. During the recording, the CS is observed making contact at the passenger side of the Equinox. WELLS is heard telling the CS, "call me," and the CS is observed walking away from the Equinox. WELLS is then heard speaking with the CS but the recording did not capture WELLS' face.

49.     The CS was observed by Officer Cordes walking back to the general location of where SA Santoyo, Officer McGill and I had dropped the CS off. Officer Cordes also observed the Equinox back out of the driveway/parking area.

50.     SA Santoyo, Officer McGill and I kept the CS under constant surveillance until they met the CS at 11:37 a.m. at the pre-arranged location. At approximately 11:38 a.m., SA Santoyo and Officer McGill turned off the multiple video/audio recording devices the CS was equipped with. The CS then turned over the purported crack cocaine to SA Santoyo. The CS was searched for items of contraband with negative results. The purported crack cocaine was later field tested with positive results for the presence of cocaine. The purported crack cocaine had a field weight of 42.82 grams. The CS was then debriefed.

18

51.     The CS advised agents that the CS walked to the area of the 2200 block of Lake Victoria Drive and waited to meet with WELLS. The CS stated WELLS arrived in the Equinox that the CS had met with WELLS on prior occasions. The CS met WELLS on the passenger side of the Equinox and WELLS was by himself. The CS provided WELLS with $1,700 USC/OAF for the purchase of an ounce and a half of crack cocaine and in return WELLS provided the CS with a plastic bag of purported crack cocaine. The CS stated WELLS told the CS to call him. The CS then walked away and met with agents at the pre-arranged location where the CS turned over the purported crack cocaine to SA Santoyo.

52.     Between 11:40 a.m. and 12:10 p.m., during the debriefing of the CS, surveillance agents followed the Equinox out of the area. Surveillance agents lost sight of the Equinox, but it was observed by DEA SA Edson parked in a lot near 5th Street and Hough Street. SA Edson observed a black female exit the vehicle and walk toward a building on the south side of Cook Street between 5th and 6th Street. The Equinox was followed out of the area by surveillance units and was observed pulling into the parking lot of the Countryside Inn located in the 2800 block of North Peoria Road by FBI TFO Redpath. Surveillance was then terminated.

53.     On April 7, 2020, SA Santoyo provided Verizon with a preservation request for the aforementioned telephone number for a period of 30-days (March 7, 2020 through April 7, 2020).

54.     In my training and experience, I have learned that Verizon is a company that provides cellular telephone access to the general public, and that

19

stored electronic communications, including retrieved and unretrieved voicemail,

text, and multimedia messages for Verizon subscribers may be located on the

computers of Verizon.  Further, I am aware that computers located at Verizon

contain information and other stored electronic communications belonging to

unrelated third parties.

55.     Wireless phone providers often provide their subscribers with

voicemail services.  In general, a provider will store voicemail messages on behalf of

a particular subscriber until the subscriber deletes the voicemail.  If the subscriber

does not delete the message, the message may remain in the system of Verizon for

weeks or months.

56.     Among the services commonly offered by wireless phone providers is

the capacity to send short text or multimedia messages (photos, audio, or video)

from one subscriber's phone or wireless device to another phone or wireless device

via one or more wireless providers.  This service is often referred to as "Short

Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often

referred to generically as "text messaging." Based on my knowledge and experience,

I believe that stored electronic communications, including SMS and MMS messages

that have been sent or received by subscribers, may be stored by Verizon for short

periods incident to and following their transmission.  In addition, providers

occasionally retain printouts from original storage of text messages for a particular

subscriber's account.

20

57.    Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems.  This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages.  Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

58.    Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received.  The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna

21

or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

59.     Many wireless providers retain information about the location in which a particular communication was transmitted or received.  This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

60.     Wireless providers also maintain business records and subscriber information for particular accounts.  This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers.  In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed).  The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

61.     In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems,

billing inquiries, or complaints from other users.  Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

62.    As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time.  Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used.  Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation.  This "timeline" information may tend to either inculpate or exculpate the cellular device owner.  Additionally, information stored by the wireless provider may indicate the geographic location of the cellular

23

device and user at a particular time (e.g., historic cell-site location information;
location integrated into an image or video sent via text message to include both
metadata and the physical location displayed in an image or video).  Last, stored
electronic data may provide relevant insight into the state of mind of the cellular
device's owner and/or user as it relates to the offense under investigation. For
example, information relating to the cellular device in the possession of the wireless
provider may indicate the owner's motive and intent to commit a crime (e.g.,
communications relating to the crime), or consciousness of guilt (e.g., deleting
communications in an effort to conceal them from law enforcement).

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

63.     I anticipate executing this warrant under the Electronic
Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and
2703(c)(1)(A), by using the warrant to require Verizon to disclose to the government
copies of the records and other information (including the content of
communications) particularly described in Section I of Attachment B.  Upon receipt
of the information described in Section I of Attachment B, government-authorized
persons will review that information to locate the items described in Section II of
Attachment B.

## CONCLUSION

64.     Based on the forgoing, I request that the Court issue the proposed search warrant.

65.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

66.     The government will execute this warrant by serving the warrant on Verizon.  Because the warrant will be served on Verizon, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

67.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

s/Russell Lehr

Russell Lehr, Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me
this 16th day of April, 2020.

s/Eric Long

ERIC I. LONG
UNITED STATES MAGISTRATE JUDGE

26

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with **217-441-1421** that is stored at premises owned, maintained, controlled, or operated by VERIZON WIRELESS a wireless provider headquartered at 180 Washington Valley Road Bedminster, New Jersey.

## <u>ATTACHMENT B</u>

### Particular Things to be Seized

## <u>I.  Information to be disclosed by VERIZON WIRELESS</u>

To the extent that the information described in Attachment A is within the possession, custody, or control of VERIZON WIRELESS, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or information that have been deleted but are still available to VERIZON WIRELESS or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), VERIZON WIRELESS is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      All voice mail, text, and multimedia messages for the period of **March 7 2020, to April 7, 2020,** stored and presently contained in, or on behalf of the account or identifier;

b.      All existing printouts from original storage of all of the text messages described above;

c.      All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from **March 7, 2020, to April 7, 2020;**

d.      All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message, from **March 7 2020, to April 7, 2020;**

e.      All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

f.      Detailed billing records, showing all billable calls including outgoing digits, from **March 7, 2020, to April 7, 2020;**

g.      All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number), from **March 7, 2020, to April 7, 2020;**

h.      Incoming and outgoing telephone numbers, from **March 7, 2020, to April 7, 2020;**

i.      All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

j.      All records pertaining to communications between VERIZON WIRELESS and any person regarding the account or identifier, including contacts with support services and records of actions taken.

2

The Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1 and 846 involving Steven WELLS since **March 7, 2020**, to **April 7, 2020,** including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.      The possession, sale, transfer, storage, transportation and distribution of controlled substances;

b.      Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crime under investigation;

c.      Evidence indicating the geographic location of the cellular device at times relevant to the investigation;

d.      Evidence indicating the cellular device owner or user's state of mind as it relates to the crime under investigation;

e.      The identity of the person(s) who created the account associated with the cellular device and/or used the cellular device, including records that help reveal the whereabouts of such person(s).

3

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by **VERIZON WIRELESS**, and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of **VERIZON WIRELESS**. The attached records consist of _____ (generally describe records) I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of **VERIZON WIRELESS**, and they were made by **VERIZON WIRELESS** as a regular practice; and

b.      such records were generated by **VERIZON WIRELESS's** electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of **VERIZON WIRELESS** in a manner to ensure that they are true duplicates of the original records; and

2.     the process or system is regularly verified by **VERIZON WIRELESS**, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____
Date                               Signature